*In re* KEENE'S ESTATE.

1. ESTATES OF DECEDENTS—LIABILITY FOR DEBTS.

By statute the entire estate of a deceased person, real and personal, is held liable for deceased's debts, after payment of the necessary expenses of administration, including costs of last sickness and funeral.

2. SAME.

The corpus of the estate is subject to creditors' liens, and the surplus after the valid and properly proved claims

are paid, rather than the gross assets, constitutes the actual estate left to deceased's distributees or beneficiaries.

3. EXECUTORS AND ADMINISTRATORS — EXTRAORDINARY SERVICES — PETITION FOR ALLOWANCE OF CLAIM.

Under section 14118, 3 Comp. Laws 1915, the executor of an estate is required to file a petition with the probate court setting forth in detail extraordinary services performed and the reasons for considering same extraordinary, and failure to file such petition renders any order allowing the claim void and of no effect.

4. SAME—ATTORNEY'S FEES—WILL CONTEST — COSTS — RIGHTS OF CREDITORS.

The assets of an estate may not be diminished to the detriment of creditors by payment of attorneys' fees and expenses of litigation in a will contest in which the creditors had no interest, and which could in no event be beneficial to them.

5. SAME—PLEADING—PRACTICE—RIGHTS OF CREDITORS.

No formal pleadings or objections were necessary in the probate court to entitle creditors, whose claims against an estate had been established, to the benefit of the court's order disallowing in part the executor's claim for attorneys' fees and his own claim for extraordinary services which were not properly a charge against the estate.

6. SAME.

On appeal to the circuit court by an executor from an order of the probate court disallowing his claim in part, creditors clearly having an interest in the litigation should be allowed to intervene and defend their rights in subordination to the main proceeding, as the ends of justice seem to require; such being within the spirit, if not the letter, of sections 12362-12364, 3 Comp. Laws 1915.

Error to Muskegon; Sullivan, J. Submitted January 22, 1918. (Docket No. 162.) Decided September 27, 1918.

John H. Banninga presented his first annual account and first special account as executor of the last will of Alice Maynard Keene, deceased. The account was disallowed in part, and he appealed to the circuit

court. Judgment affirming the order of the probate court. The executor brings error. Affirmed.

*H. Monroe Dunham* and *John M. Dunham,* for appellant.

*Cross, Vanderwerp & Foote* and *R. J. Macdonald,* for appellee creditors.

STEERE, J. This case is supplemental to the litigation in *Re Keene's Estate,* reported in 189 Mich. 97, which resulted in affirmance of a judgment on verdict of a jury rendered in the circuit court of Muskegon county sustaining an alleged lost will of Alice Maynard Keene, a resident of Muskegon, who died in the city of Grand Rapids some time in December, 1913, supposed at the time to have left an estate of considerable magnitude, which upon probation proved so disappointing as to give rise to the present controversy, which is mainly a contention between her creditors and attorneys engaged by her executor, to sustain her lost will, as to whether the latter's fees or the creditors' claims should have priority in the distribution of the assets of her estate.

The present litigation had its origin in objections interposed by certain of deceased's creditors to allowance of portions of the "first annual account" and "first special account" of J. H. Banninga filed in the probate court as executor of deceased's estate under her sustained lost will. Banninga was appointed executor in September, 1914, and his first annual account was filed September 7, 1915. His first special account was filed July 22, 1916. Amongst the items of those accounts which he sought to have allowed were numerous rendered bills of fees paid attorneys for professional service, amounting to $1,429.08, and claims of the executor for extra services aggregating $701.25. It is undisputed that most of the services

rendered by attorneys whom the executor employed were in connection with the will contest, presumably begun and pursued in the interest of beneficiaries under the will, a litigation which could not affect the original *quantum* of the estate or the rights of creditors of deceased.

The substance of objections interposed before the probate court was that the allowed claims of creditors should first be paid, and should not be delayed or jeopardized by the will contest or expenses incurred in connection with it; the concluding objection summing up as follows:

"By the allowance of this claim and the allowance of the claim of attorneys claiming to represent the executor, the estate of the said deceased will be wholly insolvent. The attorneys' bill to date, as filed, shows a claim of $2,425.90, and the executor's account a claim of $701.25. Most of which charges are entirely out of proportion with the services rendered; some of them are illegal as expenses of administration in advance of the payment of creditors and show a studied attempt on the part of the executor to so administer this estate that there will be nothing left for creditors, whose claims have been allowed by the court, and whose claims should first be paid, at least in advance of all claims except statutory fees."

The probate court in passing upon the executor's accounts held he should be allowed his statutory fees for services, $100 for attorney's fees, and $200 additional for services and expenses, the order concluding as follows:

"It is ordered, that said accounts be and they are hereby allowed, except items aggregating $1,429.08 for attorneys' fees and disbursements on account of suit in the circuit and Supreme Courts, which are hereby disallowed, except the sum of $100, without prejudice, however, to said executor to make claim for payments for attorney's services when the creditors are paid; * * * that the executor be allowed

the sum of $200 for his services and expenses, without prejudice to his right to make claim at some future accounting for compensation for extraordinary services.

"It is further ordered that said executor pay the sum now in his hands, to wit: Twenty-nine hundred eighty and 74/100 dollars, to the creditors of said deceased within 30 days from the date of this order."

This order was affirmed, in substance, on appeal by the executor to the circuit court of Muskegon county.

The statement of facts in *Re Keene's Estate, supra,* are helpful to an understanding of the controversy here and the situation as a whole which confronted the probate court when passing on appellant's accounts.

On deceased's death she left in Muskegon some tangible assets in the shape of real estate depreciated in value by the trail of the serpent over them in the use to which they had been devoted, and some creditors whose claims this property was adequate to liquidate if devoted to that purpose through the ordinary processes of probation. Her only ascertained relatives having possible interest in her estate were a brother and his family, living in Iowa, and a random husband from whom she was separated and against whom she had instituted divorce proceedings. Her life and associations had been such during the 20 years of her residence in Muskegon that beyond those things directly visible her financial circumstances and private affairs were matters of conjecture and gossip.

After Mrs. Keene's death no will was found and upon petition of her brother from Iowa, Frank Maynard, an administrator was appointed, in December, 1913, and probation of her estate begun in the probate court of Muskegon county. Banninga was a real estate operator who had done some business for deceased during her lifetime and in 1900 drew her will for her in which he was nominated her executor. In

June, 1914, he found in his desk what he testified was a pencil copy of the original will as he had drawn it for her, and, upon consultation with the attorneys who afterwards conducted the contest, advised Frank Maynard as one of the heirs to sign a petition for probation of the lost will. Banninga was the principal witness in the will contest and here. He testified in the instant case that he employed counsel for the purpose and the "total amount of the services rendered by the attorneys as shown by these statements is $2,425.90," which from his experience in such matters he considered a reasonable charge for their services, and, in explanation of the uncertainties and embarrassments attending the undertaking, said:

"The arrangement was made that if the will was not established the attorneys were not to have any claim against me personally, but if the will was established they were to put in their bill for a reasonable amount to me as executor of the estate and I would see that they were paid. They stated to me that it was rather a complicated case and therefore more or less speculative, and that if they won they would expect a larger fee than if they didn't win. They paid the costs until I became executor and took charge of the estate. The character of the parties themselves had something to do with the question of fees. The parties were irresponsible to a large extent, both Mr. and Mrs. Maynard being addicted to the drug habit and Mrs. Keene herself had been known as Queen of the Sawdust in Muskegon and was also known as a famous sporting woman. She kept a number of houses of prostitution in Muskegon. Gust Keene, her husband, was an ex-saloonkeeper for a time and had the reputation of being an ex-convict. A good many of the witnesses and parties mixed up in the case were or had been inmates of houses of prostitution and were people of such character and reputation and these things were all talked over at that time."

He was appointed by the probate court executor under the will, in September, 1914, and after qualifying

as such took charge of the estate, administration of which had in the meantime been pending in the probate court as of one dying intestate. It was stated by counsel, without objection, that claims against the estate, some 12 or 14 in number, were passed upon by that court, June 20, 1914. Banninga testified that the total amount of claims allowed according to the files is $2,805.36, none of which had been paid by him, and the records show that they remain unpaid.

Banninga's assertion that this was an "extraordinary case," appears to be fairly borne out by his narrative in justification of his claim for extra compensation, relating the disappointments and difficulties he encountered in attempting to find and realize on the supposed assets. He testified that the general impression was from shortly after Mrs. Keene's death until the appraisers made an inventory that her estate was worth $25,000 to $40,000, but when he qualified as executor it proved to be worth only about $7,000; that before her death Mrs. Keene owned many large and valuable diamonds and he had learned there were safety deposit boxes in Chicago in her name, to which color was added by the fact that "Bud Leonard" who claimed to have been with her in the Fort Dearborn bank "said there were large sums of money and jewels and diamonds and so forth"; promising to tell them "the number and so forth"; but they were unable to find a record of any such thing "after diligent search in numerous banks in Chicago, neither under the name of Stamp or Maynard or Keene or any other alias she used to go under," and none of those things could be found, the result being that the assets of the estate which he was able to secure dwindled to a property called the St. Elmo hotel, upon which there was a mortgage, two properties which had been sporting houses, and some furniture. The probate judge informed him after he was appointed executor that the

estate could not rent property for immoral purposes and if he did so he would likely get into trouble and in all probability go to jail; the State fire marshal also informed him the houses must be closed until the chimneys were rebuilt, and the mayor of Muskegon at one time told him "that the property must be cleaned up or the authorities would close it, on account of the filthy condition and the dilapidated state of affairs of the property." But in spite of these embarrassments and various others which are detailed he states that "through my efforts I realized $7,000 for the estate"; he having on hand, as found by the probate and circuit courts, $2,980.74.

One somewhat serious objection suggested against appellant's claim for increased fees and extra allowances, for services rendered in person and disbursement in the employment of attorneys and otherwise, is his failure to file the requisite statutory petition in the probate court presenting the unusual difficulties and responsibility which demanded the extraordinary services and disbursements for which allowance is sought. The executor's fees and per diem are fixed by statute, in addition to which he is entitled to allowance of necessary expenses in care, management and settlement of the estate; beyond that the probate court may make allowance for "extraordinary services" on proper presentation and proof of the same authorizing the court to act. To move the court in that particular the statute provides, section 14118, 3 Comp. Laws 1915, that—

"In all cases where the executor or administrator shall perform any extraordinary services, not required of an executor or administrator in the common course of his duties, and in cases of unusual difficulty or responsibility, such further allowance may be made as the judge of probate shall deem just and reasonable: *Provided, however,* That such allowance shall only be made upon the filing of a petition therefor, setting

forth in detail such extraordinary services, or the reasons for considering the case one of unusual difficulty or responsibility, and the order making any such allowance shall recite in detail the extraordinary services for which such allowance is made, giving the amount allowed for each item thereof, or the reasons for considering the case one of unusual difficulty or responsibility; and in case the order does not contain such recitals as herein required, the same shall be void and of no effect."

After the case had reached the circuit court on appeal, appellant's counsel asked leave to amend his accounts into a more formal petition covering his claim for extraordinary services and expenses in conformance with the statute. This was held not within the power of the appellate court, because the matter had never been properly presented by petition, as the statute requires, to the probate court from which the appeal was taken and in which original jurisdiction rested. As applied to appellant's own services, at least, this view finds support in the somewhat analogous case of In re Thompson's Estate, 183 Mich. 618. The question is, however, of minor importance here, for both courts reserved to appellant the privilege of presenting the rejected items of his accounts by appropriate petition in the probate court "when the creditors are paid," a sequence against which appellant seriously protests, and the real pivotal issue between these parties is whether charges by the executor for his special services and those of attorneys employed by him in a contest to establish a lost will, a matter of no concern to appellees, can be allowed or paid until the proved claims of creditors for debts incurred by deceased in her lifetime have been taken care of.

It seems self-evident that the *quantum* of the estate as such could not be affected by whether there was or was not a will. It was a matter of indifference to the creditors what became of the residue of the estate

after the debts were paid. It was nothing to them who the beneficiaries were, or whether they took by will or by inheritance. By statute the entire estate, real and personal, is held liable for deceased's debts, after payment of the necessary expenses of administration, including costs of her last sickness and funeral. 3 Comp. Laws 1915, §§ 13794, 13887, 13888. Until the valid and properly proved claims of those who extended credit to deceased in her lifetime for money loaned, goods sold or services rendered are paid, the unearned gratuities to beneficiaries under her will or inheritances to her heirs are postponed and contingent, the corpus of the estate is subject to creditors' liens and the surplus rather than the gross assets constitutes the actual estate left to deceased's distributees or beneficiaries.

"The law subjects the assets of a deceased person to the payment of his debts, and for this reason the creditor has an equitable lien thereon, which he can enforce through the administrator in a proper case for equitable interference." *Pierce* v. *Holzer*, 65 Mich. 263, 273.

"Under our system the settlements of estates of deceased persons are essentially proceedings *in rem* (*Howard* v. *Moore*, 2 Mich. 226), as they are in most of the other States, in which the *res* is the decedent's estate and the *jus ad rem* is in the creditor. Upon the death of a person leaving creditors, the debts, previously personal obligations, become immediately property obligations, with all the force of a lien upon a debtor's estate." *Lafferty* v. *People's Savings Bank*, 76 Mich. 35, 51.

Cases cited by appellant where fees of counsel and other expenses incurred by an executor or administrator in prosecuting or defending litigation directed to increasing or conserving the amount of the estate are held to be proper expenses of administration because for the benefit of the whole estate as such, and will contests where no rights of creditors are involved,

are not analogous in facts or point involved. Here the creditors are opposing diminution of an estate, upon which they have a lien, by the expenses of a litigation which jeopardized their claims and could not in any event be beneficial to them.

Under the circumstances of this case we are not impressed with appellant's contention that it was his legal or moral duty to assume and aggressively conduct the prosecution of this will contest. He claimed no family or social relations with deceased nor personal obligations to her. He had simply done some business for her and at one time drawn her will at her request, in which he was named as executor, and had subsequently delivered the will to her. When she died he neither had possession of the will nor knew where it was, and it was never found. The statute is not directed to such a situation. *Barney* v. *Barney*, 192 Mich. 45. Had he been the custodian of it or known where or with whom it was deposited the statute invoked might be material. Conceding that in fairness and as a moral duty he should inform those who might be beneficiaries under the will or interested in the estate of the facts known to him, when he had done this his moral obligations were fulfilled except as those interested in the estate might require his services as a witness. When the lost will was finally sustained and admitted to probate, it was discretionary with the court to appoint him executor and if appointed he was under no legal obligations to accept the appointment. So far as any legal or moral obligations are concerned, he was perfectly free after advising those directly interested of the facts he knew to leave the will contest to them. After he became executor he represented the estate and as its assets reached his hands in due course of administration it was his duty to conserve and apply them according to law, under the direction of the court, in paying the debts, claims

and charges against the estate in legal order of preference. The cost of a will contest between prospective distributees of a deceased person's estate is not naturally or usually to be recognized as a reasonable or necessary charge incurred by reason of his or her death. As applied to the situation presented here, the right of the matter is well reasoned out in *Mumper's Appeal,* 3 Watts & Serg. (Pa.) 441, where the status of those interested in an estate but not in a contest between heirs or beneficiaries is discussed in part as follows:

"As regards the *quantum* of the estate, it is a matter of indifference whether there be a will or not. Will or no will, is a question which cannot affect the estate, in this respect, in the slightest degree; but it may be, and generally is, a matter of great interest to those who claim as legatees or devisees under the writing purporting to be a will. They are the only persons interested in establishing it as a will. While, on the other hand, the heirs-at-law, or next of kin to the deceased, who are either excluded by the writing from receiving any portion of the estate, or as much of it as they would be entitled to in case of intestacy, are the persons principally interested in opposing the establishment of the writing as a will. If the person appointed by it as executor be named also as a legatee or devisee, then as such he may be deeply interested also in establishing it to be the last will of the deceased. But it is clear that creditors and the rest of the world have no interest whatever in the question. It would, therefore, seem to be just, as well as equitable that those who have an immediate and direct interest in the question should be left to contest and bear all the costs and charges attending it. It ought to be left to them to employ counsel or not, as they please; and consequently to bear the expenses of doing so."

*Vide,* also, 2 Woerner's American Law of Administration (2d Ed.), § 516.

It is further contended for appellant that the cir-

202—Mich.—42.

cuit court, where the issue was tried *de novo,* had no right to make the order complained of because only the Michigan Trust Company, as executor of the Torrent estate, had filed formal objections to his accounts in the probate court, which were subsequently abandoned, or withdrawn when its duties as executor had ended, and the three creditors who appeared for the first time in the circuit court were not entitled to be heard or participate in the trial. The Michigan Trust Company as executor of the estate of John Torrent, a creditor of deceased, did file its objections in the probate court and was there represented by counsel who pressed the objections at the hearing in which that court passed upon the executor's accounts. R. J. Macdonald, a creditor who testified that he also appeared in the matter in the court below, filed written objections in the circuit court and appeared in person at the trial. John D. Vanderwerp and the Pine Street Furniture Co., also creditors with proved claims, entered their appearance in the circuit court and were represented by counsel at the trial. Although at the time of trial in the circuit court the Torrent estate was in effect fully probated and the trust company's duties of administration ended, no formal order discharging it as executor had been made or entered and counsel who appeared for it and other creditors in the circuit stated to the court: "I was informed that until they were discharged I was to continue the matter."

All the creditors whose claims against the estate had been established were interested in this issue. No formal pleadings or objections were necessary in the probate court to entitle them to the benefit of the court's order as made. Whether they filed objections or not it was the right and duty of the probate court to judicially pass upon the executor's accounts and to disallow any items the court found unwarranted or illegal. Their rights were protected by the order until

the executor's appeal attacked them. The hearing in the circuit court was confined to the order appealed from and the same questions in relation to it which were before and passed upon by the probate court.

Even conceding that this step in the probation of an estate in compliance with statutory requirements that the court shall pass upon and allow the executor's accounts becomes, on appeal, in its nature an action at law or suit in equity, we see no sound objection in reason or rule to the circuit court on trial of the same issues of law and fact *de novo* permitting those creditors clearly having an interest in the litigation to intervene "at any time," and defend their rights in subordination to the main proceeding, as the ends of justice seemed to require, which is within the spirit, if not the letter, of sections 12362-12364, 3 Comp. Laws 1915.

Under the foregoing views on the meritorious and controlling questions involved, we find no technical demand for reversal in appellant's various assignments of error and the judgment, or order, of the trial court is therefore affirmed.

OSTRANDER, C. J., and BIRD, MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.